Case No. 23-5117 William Yarbrough v. Henderson County TN et al. Oral argument not to exceed 15 minutes per side. Mr. Russell for the appellant. Good morning. Good morning. May it please the court, Haynes Russell for appellants. If I could reserve 3 minutes for rebuttal. Very well. Judge, we're here today because the district court erred in denying appellants qualified immunity where appellants acted to protect Mr. Yarbrough during his brief day and a half long incarceration. And where there is no existing case law under the second prong of qualified immunity that provides fair notice, the actions taken by the appellants were constitutionally insufficient. And I'd like to start with the second prong, whether or not there is any existing case law that would have placed appellants on notice that they violated Mr. Yarbrough's constitutional rights. Here the district court erred in two critical ways. One, the district court impermissibly shifted the burden to defendants to come up with a case that shows that they did not violate appellee's constitutional rights. And then two, they failed to analyze it on an individualized basis whether there was any existing case law that would have placed each individual defendant on notice that they were violating Mr. Yarbrough's constitutional rights. It's well established, it's plaintiff's burden of proof to show a right was clearly established. And in order to overcome this burden, plaintiffs must identify a case with a fact pattern similar enough to give fair warning that they were violating his constitutional rights. In satisfying this standard, they must show that the precise question at issue was beyond debate. Here, generally, Mr. Yarbrough's alleged that appellants should have called the outside mental health care provider pathways about his condition. And in order to satisfy this burden, they first pointed to a right generally to mental health treatment. This circuit's case law and Supreme Court case law has clearly shown that just citing to a general right is not sufficient to establish the second prong of qualified immunity. Notwithstanding, in an effort to cite something more specific, they point to Clark Murphy v. Floorback. That case is entirely dissimilar to the one here and does not provide fair warning. In Clark Murphy, the inmate collapsed outside in 90 degree weather, having a heat stroke. Officers observed this and before he collapsed, his behavior was not delusional. After he collapsed, which they observed, he began acting delusional. They had to wheel him back into the prison. And they thought that he had had a seizure. And because of his delusional behavior, they placed him in the psych unit of the prison there. The day afterwards, they noticed he had no water. But they didn't do anything. They didn't provide him water, despite noticing that there was no water in his cell whatsoever. The second day, he begins complaining, hey, I don't have water in my cell. They still do nothing. They even see him drinking out of the toilet and do nothing. Additionally, at some point, per policy, because he's in the psych unit, a psychologist comes and diagnoses him with psychosis after asking him some questions. But no further mental health treatment was provided at that time. Besides for Clark Murphy, don't we have cases that say when detainees are suicidal or engaging in self-harm, that those are times when the failure to address that amounts to deliberate indifference under here the 14th Amendment for pretrial detainees? Sure, there is cases that establish a right to treatment where there's suicidal or self-harm. And isn't there self-harm here? I mean, this guy ran headfirst into metal doors, did it some 15 times. I mean, we know from the hospital stuff later that he almost did die from his self-harm. So I don't understand why this then wouldn't fall within those cases about self-harm. I think this is distinguishable from a suicide case or a self-harm case. One, there's no allegation that he was attempting to commit suicide or he was attempting self-harm. The allegation is that he was delusional. Officers, when he arrived, informed that he was intoxicated. There's no allegation that he was engaged in self-harm? Well, I think there's a distinction to be made between self-harm as in I'm attempting to harm myself versus actually harming himself. I'm not disputing that he potentially harmed himself. Is there better evidence of self-harm when he's actually doing it rather than just saying he might do it? Well, I think he was hallucinating. He wasn't attempting to harm himself. He ran into a door with his head at least 15 times, if not more. I mean, and the defendants here testified that they actually indeed saw these things as acts of self-harm. That's in the record. Well, I think it's important to point out that the defendants did act when they saw him running into the door. They restrained him and then had him monitored biomedically. He was actually seen by the nurse seven times throughout May 16th. So they did do something to address that concern. As far as them testifying that it was self-harm, it really depended on the defendant. Some of them testified that they thought it was self-harm. Others, Lieutenant Balsman, who is named, she testified that what I'm talking about, the distinction between self-harm as in I'm trying to hurt myself versus him harming himself because he was delusional and hallucinating. He received absolutely no mental health treatment while in jail. That's correct, right? Not from a mental health professional. Right. I mean, obviously he has a serious mental health problem. And it's well established that pretrial detainees have a right not to be deprived of mental health treatment. And your clients have a duty not to be deliberately indifferent to that. So I mean, I guess your only argument is what? You haven't found a case where you had somebody who tried to ram his head 15 times so that you only could find a case that he did it five times or six times? I mean, every case is a little factually different. But we have all sorts of cases that say that, no, you're not entitled to qualified immunity if you're deliberately indifferent to an obvious mental health problem. And it's hard to say that the motion should have been granted, that's all. Right. I'd like to go back. Your best argument is you can't find a case that has exactly the same facts. Well, every case, there's not going to be a case that has exactly the same facts. But we have a lot of cases. Sure. And I don't want to, it has to put the precise question behind the bait. I agree that there doesn't have to be the exact facts that are alleged here. I think it's important to point out that it wasn't obvious to the officers at the time that he was suffering a mental health emergency. Okay. When he arrived, the arresting officer informed that he was intoxicated. It's undisputed that his behavior at booking and intake was consistent with intoxication. And so they placed him into the booking cell to monitor him and give him time to sober up. But don't we have cases like Green v. Crawford where somebody's intoxicated and they're hallucinating and showing these very strong signs of withdrawal and we say there that there's no qualified immunity and the officer should have provided medical attention? I think those cases... So even if they thought he was intoxicated, they should have provided some sort of care here, which they didn't, and more than, I mean, we said in Green v. Crawford, more than just watching him. Well, they did do more than just watch him. As discussed, when he hit the door, they restrained him. But also when he arrived and ran into the door and he was restrained, nursing was called and informed of that. And then throughout May 16th and May 17th, nursing saw him repeatedly. Yeah, but that was for the medical condition, not his psychological condition. And that's the argument here, that there was no psychological treatment or mental treatment rendered at all, which is very much, I think, like the Green case, if I remember that right. Right, but here it's undisputed that at no point were they able to tell whether or not he was intoxicated. Well, okay, didn't the district court make a ruling on that, that this was as a result of his mental illness and not intoxication? That's a fact. In hindsight, he was suffering a mental health emergency. Isn't that what the district court ruled? It is. All right, we're not disputing that. You can't appeal that fact to us, can you? No. All right, so we accept that fact that it's caused by the mental illness. Right, and in hindsight it was caused by mental health and not intoxication. But it's undisputed that at the time he was incarcerated that they weren't able to distinguish between the... He was incarcerated for 40 hours. So the officer that saw him at hour 39 couldn't distinguish, thought he was still intoxicated after 39 hours. That's undisputed. Lieutenant Baldwin testified that in her experience, sometimes when people are on meth or something stronger, that it actually takes them two to three days to come down from that substance. What is the importance of the... I think it's an agreed fact that Pathways wouldn't take someone who was intoxicated for that first 24-hour period. I think it goes to whether or not, especially over the first 24 hours, whether or not those defendants acted with reckless disregard because Pathways wouldn't have come even if they had called because of the belief he was intoxicated. So Appellant Simpson, Appellant Owen, both of them were only there for booking absent Owen being at the hospital when he arrived on May 17th. So both of them had no interaction with him except during that 24-hour period. We cited numerous cases in our brief about how where someone arrives intoxicated or believed to be intoxicated, there's no constitutional violation where they're not provided immediate medical treatment. What happens at the end of the 24 hours? Well, I think that as far as calling Pathways as a result of the intoxication, everything after the 24 hours, I don't know if that fact would be relevant. But there is testimony through Lieutenant Balsman that where someone's combative as well, that's not something that would normally warrant calling Pathways as well. That they don't like taking them when they're combative. But they didn't call to find out, did they? No, it's undisputed they did not call. And I think that goes to whether or not they're providing... See, I'm out of time. No, please answer. Whether or not they're providing specific treatment because they did act. They did restrain him. He was provided medical care through the nurse. She never informed anyone that she thought he should go to the hospital or for mental health treatment until he was in fact... The district court granted you qualified immunity as to the medical care claim. Did it not? He held that the objective problem wasn't satisfied for the delay in care for the physical injury, the pulmonary emphysema. So, I mean, you won that part. But, I mean, we're just talking about the mental health treatment that was not rendered, right? That's correct. Okay. All right. You're out of time. You can use your rebuttal now or you can save your three minutes. I'll save it, Your Honor. All right. Let's hear from counsel for the appellee. May it please the court. I'm Leanne Thorne and I represent William Christopher Yarbrough in this matter. We urge this court to affirm the denial of qualified immunity as it relates to Mr. Yarbrough's mental health needs. I want to address first the clearly established prong because that's what my esteemed opposing counsel has addressed first. As far as Clark Murphy is concerned, the court mentioned in the earlier argument that there are a line of cases, a significant line of cases, in which this court has held that mental health needs are serious medical needs. In fact, they can rise to the level of an emergency. They can be life-threatening. And in this case, that's exactly what they were. They were life-threatening. There are cases in which this court has held that suicidal tendencies result in a serious medical need, and that's what we had here. Just because he was not fashioning a noose doesn't mean that he wasn't attempting suicide. He ran headlong into a steel door at least 15 times. He hit his hand on the door so hard that the correctional officer feared that he had broken his hand. He stripped naked. He defecated and urinated on himself. He was hallucinating. He was attempting to run through the Sally Port door. This went on consistently for a period of 40 hours. And I believe it's a dishonest statement to say that they did not believe that he was self-harming. In fact, every single defendant in this case, every single appellant testified that he was self-harming. He was harming himself. It's a very simple concept. And in Clark Murphy, which was the primary case we cited, there's a string cite of about 10 cases in which this court has held that mental health needs are serious. And although opposing counsel would like to think Clark Murphy bears no resemblance to this case because we didn't have water shut off in the cell, there are a number of similarities to Clark Murphy. And we put those in our brief starting at page 62. Like Clark Murphy, Yarbrough was crying and speaking nonsensibly, which was suspected to be related to a mental problem. He was placed in an observation cell. So the officers could look in on him more frequently. He was once placed under observation. They knew that he was behaving abnormally. They knew that or believed that his symptoms could be attributed to a number of causes. In Clark Murphy, they thought he was faking. In this case, they thought he was intoxicated, presumably. Like Clark Murphy, most of the contact with Yarbrough was made through a closed cell door. I know counsel has said the nurse saw him seven times. She interacted with him face-to-face twice because when she attempted to approach him, he believed that the thermometer that she was holding was a gun. She could not even assess him physically, and she was not qualified to provide or diagnose a mental health problem. Is that something that the officers should have been responsible for or aware of, that she was not a psychiatric nurse? Yes, Your Honor. They each testified that they knew that she was not a mental health provider, that the exclusive mental health provider for the jail was Pathways. They were available on call. Her own testimony was that she is not a mental health provider and she's not qualified to do any mental health treatment. She's an LPN. So each and every appellant in this case testified to that. They all knew that Pathways was the only way to get mental health treatment. They all knew that it was a crisis hotline. It was manned 24 hours a day. Does it make any difference that they also apparently knew that Pathways wouldn't come for someone who was intoxicated, at least for that first 24-hour period? Your Honor, we had one appellant, I believe, one appellant that testified to that, and here's what I'll say, that Appellants Simpson and Owen testified that they were trained to immediately call Pathways. Number one, because he came in on a psych hold. That's the other thing that needs to be remembered here. He was saying earlier that the arresting officer thought he was intoxicated, but in fact he was brought in on a psych hold. He was arrested for domestic assault, resisting arrest, and he was placed under the designation of psych hold. Officers Owen and Simpson, along with all the others, testified that when someone comes in on a psych hold, they are to immediately call Pathways. Now when Pathways responds, it's up to them. As far as intoxication is concerned, Mr. Garber wasn't intoxicated. What would have happened if they had called Pathways was Pathways would have told them to take him to the hospital to be tested for drugs or alcohol, and then they would make the designation of whether or not they would take him or not. But they aren't going to respond if they're never called, and that's what happened. Each and every officer said Pathways was the only way to get mental health care, and they knew that. You have one officer here, Officer Bosman, who never actually saw Mr. Garber. She seems to be in kind of a supervisory role. Is your theory of liability as to Officer Bosman responding at superior supervisory liability claim, or is it that she was herself supposed to do something, and if so, why? She was herself under an obligation to do something because her testimony was that she received several calls about Mr. Garber over the weekend. She didn't work weekends because she was a supervisor, and by the time he got there, it was a Friday evening at 10 p.m., so she was already gone. But she got numerous calls about him. Her testimony was that she was aware that he was self-harming and he was a danger to himself. I believe the quote from her testimony, Your Honor, is when anyone does anything so extreme as to hit the door with their head, I usually get a phone call. And so when she said that, I believe that that obviously put her on notice that there was a problem, and she had an obligation to call Pathways just as every officer did. How about Austin Owen? He has apparently very limited involvement as well. Mr. Owen was on the scene, and he assisted getting him from the car. Mr. Owen was present when immediately upon getting out of the car, Mr. Garber ran headlong into the closed Sally Port door. He ran into the door immediately, and that's why he was put in the restraint chair the first time. Mr. Owen testified that he knew that symptoms of intoxication and mental illness can overlap, and he testified that he knew that once someone was placed in the restraint chair that they were to call Pathways. He did not do that. He also made a couple of the entries on the restraint chair log in which Mr. Garber was hallucinating and delusional, and he also testified that at that point Pathways should have been called, but they were not. Mr. Owen, if I recall, and correct me if I'm wrong, he testified that when he helped take Mr. Garber to the hospital, his neck was much more swollen than at the end of his second shift, so he also must have seen then Mr. Garber at the end of his second shift about some 32 hours into this. Correct. His shift would have been 6 p.m. to 6 a.m., so his shift would have ended the morning of May 16th, and when I probed him about that, he backed up and said, no, I don't really remember his neck being swollen at that point, but yes, by the time obviously when the final shift came on before he went to the emergency room, he was in subcutaneous emphysema and was in a life-threatening situation. Did the district court analyze the claims as to each individual defendant? Yes. I believe it was a 60-page opinion, Your Honor. It was a very lengthy opinion. Everything in this case has been lengthy from the briefing to the opinions in this case, and yes, you went through each and every defendant and talked about each and every one. Now, the clearly established law, Paul, is going to be similar for all of them because they all saw the same things. They all saw him hallucinating. They all saw him self-harming. Yes, but some of them were with him much longer than others. Anyway, you say that the district court did differentiate among the defendants. They certainly did do an individualized analysis, yes, Your Honor. Okay. Picking back up, I know there were a line of questions, but like Clark Murphy, he was hallucinating. He refused to communicate with officers. Like Clark Murphy, he was beating on the door. Like Clark Murphy, officers observed and noted that he was continuing to exhibit symptoms of mental illness, including yelling and talking to himself. He hadn't slept in many, many hours, throwing his food on the wall, disrobing himself. There were a number of psychological symptoms that were identical to Clark Murphy. And Your Honor made an excellent point. There's never going to be a case exactly where each and everything is just as a previous case, and that's not required. It's just required that there be sufficient facts to put the defendants on notice that their behavior would be unconstitutional. And here, by merely observing him, they did not render any aid to him for his mental health treatment. Putting him in a restraint chair was not mental health treatment. Your claim, in essence, is not that they didn't render any kind of treatment or assistance, but that they were aware, not even that they should have been, but that they were aware of all the things that he was doing that were indicative of a serious psychological problem, and aware of that, they had an obligation under the Constitution to obtain mental health assistance for this prisoner. Once they were on notice that he was exhibiting multiple symptoms over many hours, that they were trained, were mental health illness symptoms, they had an obligation to do more than merely observe him. They had an obligation to pick up the phone and call the 1-800 number and get a crisis evaluation. That was their obligation. Mere observation is not enough, and the point at which it becomes not enough is a jury question. And so that is exactly what the district court said. Even if they thought that perhaps he was intoxicated, at some point a jury could find that that was not a reasonable assumption given the continuation of his symptoms and the escalation of the problem that he had. So one of the things I've been trying to figure out on this is, so I know that we had the physical disability difficulties, and those were dealt with separately by the district court, but what is the resultant injury to him because of the, as you are claiming, denial of his constitutional right to have psychological intervention and treatment? How was he injured by that? Well, for 40 hours he was in torment. The diagnosis was a severe manic episode with psychotic features. So the damage to him was that he sat in a concrete cell with no toilet, with no sink, in a box with no help whatsoever for 40 hours when they could have gotten him help much earlier. He ended up being hospitalized for 11 days. He was in restraints, restrained to the bed. He had to be administered multiple mental health medications. So it's just the same with appendicitis if we're looking back to Blakemore. The person suffers because they're in pain. They don't have to necessarily die from it, but he suffered, and this was an obvious serious medical need. He was running into a wall with his head. He was hitting his hand so hard that they thought he broke it. But obviously the physical injury is a resultant damage of this mental health episode as well. It's not just that he was in that mental torment, but he also had a resultant physical injury from that self-inflicted harm, which is what the Vanderbilt University Medical Center call it, self-inflicted blunt force trauma that was so damaging that he punctured his lung and he had to be intubated and placed in life support. Thank you. Thank you. Unless the court has any other questions for me. Any further questions? Thank you, Ms. Thorne. Thank you. Mr. Russell, three minutes rebuttal. Yes, Your Honor. I'd like to address the objective prong argument we made also in our brief about whether or not this was an obvious medical need. Now, certainly his symptoms were obvious, the delusional behavior, the hallucinating, but we would argue that the actual serious medical need or whether or not it warranted a doctor's attention at that point was not obvious. Because it needs to be so obvious that even a lay person would easily recognize the necessity for a doctor's attention. How much worse should it have been? Say that again. Sorry, Your Honor. How much worse should it have been before you might say that even a lay person would realize that this is a real serious problem here? Well, I think they acted to address what he was doing. I think that's important as far as they restrained him when he hit his head on the door and he was hallucinating. They expected him to sober up is what happened because when he arrived, they were told he was intoxicated. And for that reason, it's not obvious because it must either involve a life-threatening condition, which his mental health needs would not be that, or a situation where it's apparent that the delay would exacerbate the problem. Because they didn't know whether or not it was intoxication or whether or not it was a mental health problem, it's not clear whether or not it would have exasperated him. In fact, if he had been intoxicated, it would have actually, hypothetically, gotten better. Where it's not obvious, it's the plaintiff's burden of proof to place verifying medical evidence in the record to establish the detrimental effect of the delay in treatment. So not just evidence that he needed treatment, but the 40-hour delay here caused him some type of further harm. And that has to be through expert testimony. And there is no expert testimony here on the objective prong or on that. So Mr. Yarbrough cannot satisfy the objective component of this 14th Amendment claim. And then going back to the existing case law prong, I'd like to point this court to Taylor v. Barks. It's a 2015 U.S. Supreme Court case. And in there, when someone came in with mental health needs, they were hallucinating. They didn't do a proper mental health screening and they didn't properly do a suicide screening and that individual actually committed suicide the next day. The Supreme Court held that there was no existing case law there to provide officers notice that they needed to do a proper implementation of the adequate suicide protocols. So similarly here, they're basically just arguing a violation of policy or some type of negligence, but that wouldn't place officers on notice that they violated his constitutional rights. Thank you, Mr. Russell. The case will be submitted.